UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| JOHN DUMITRU, | ) | |
|---|---|---|
| Petitioner, | ) | |
| | ) | Case No. 3:14-CV-534 JD |
| v. | ) | |
| | ) | |
| SUPERINTENDENT, | ) | |
| | ) | |
| Respondent. | ) | |

## **OPINION AND ORDER**

This is a habeas corpus proceeding brought pursuant to 28 U.S.C. § 2254 by John Dumitru. In it he challenges his convictions and 100 year sentence[1] by the Starke Circuit Court on June 25, 2001, under cause number 75C01-0004-CF-27. Though he filed this case *pro se*, the court subsequently appointed Michael Parkinson to represent him pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A(a)(2)(B), "because without the assistance of counsel in this case, the court [would have been] unable to assemble the facts and arguments necessary to know whether Dumitru's claims ha[d] been properly addressed." DE 21 at 2. Micheal Parkinson is an experienced habeas corpus litigator who has appeared before this court in 32 habeas corpus cases during the two decades recorded in the court's CM/ECF computer records. The court appreciates his able review of the facts in this case and his presentation of a Traverse. Though this order denies habeas corpus relief, his assistance has focused the legal issues involved in this case and made it possible for the court to be confident that they have been properly addressed.

---

[1] "The trial court sentenced Dumitru to sixty years for [his step-daughter]'s murder, forty years for the attempted murder of [his wife], two years each for the neglect of a dependent convictions, and one year for the resisting law enforcement conviction. The trial court ordered the sentences for murder and attempted murder to be served consecutively, for a total executed sentence of 100 years. *Dumitru v. State*, 75A05-0108-CR-384 (Ind. Ct. App. March 28, 2002), 13-6 at 4.

Dumitru raises six grounds for relief in his habeas corpus petition. DE 5 at 3-9. In the Return, the Respondent argues that the court cannot consider the merits of those claims because the petition is untimely. Habeas Corpus petitions are subject to a strict one year statute of limitations.[2] The statute provides four possible dates from which the limitation period could begin to run. Of those, the Respondent argues that the court should apply 28 U.S.C. § 2244(d)(1)(A) and calculate the 1-year period of limitation from the expiration of the time for filing a petition for transfer with the Indiana Supreme Court. In his Traverse, Dumitru acknowledges that his petition is untimely. He does not disagree with the applicability of § 2244(d)(1)(A). Neither does he disagree that his conviction became final when the time for filing a petition to transfer expired.

The Court of Appeals of Indiana finished with Dumitru's direct appeal on March 28, 2002. DE 13-1 at 2. Thus, the deadline for filing a petition to transfer ended[3] on April 29, 2002, and the limitation period began the next day. It then ran until Dumitru filed a post-conviction relief petition on March 20, 2003. DE 13-1 at 9. While the post-conviction relief petition was pending, the

---

[2] 28 U.S.C. § 2254(d) provides that:
(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
    (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
    (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
    (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

[3] *See* Indiana Rules of Appellate Procedure 57.C. which provides that a notice of appeal must be filed within 30 days. *See also* Indiana Rules of Appellate Procedure 25.B. which provides that when the last day is a non-business day, the deadline expires the next business day.

limitation period was tolled pursuant to 28 U.S.C. § 2244(d)(2). However, before it was tolled, 324 days had elapsed and Dumitru had only 41 days remaining.[4] The tolling ended on December 5, 2013, when the Indiana Supreme Court denied transfer in Dumitru's post-conviction appeal. DE 13-3 at 2. The 1-year period of limitation then began again, and expired 41 days later on January 15, 2014. The parties agree that this habeas corpus proceeding was not timely filed because Dumitru did not file a habeas corpus petition by that date.

On March 12, 2014, Dumitru mailed a document to this court which was captioned, "Motion for Investigation." DE 1. In it, he requested an "investigation before he files the Habeas Corpus Petition in the Court . . .." *Id.* at 5. As that filing made clear, it was not "an application for habeas relief seeking an adjudication on the *merits* of the petitioner's claims . . .." *Woodford v. Garceau*, 538 U.S. 202, 207 (2003). Therefore it did not constitute a habeas corpus petition[5] to which a subsequent filing could relate back. *See Mayle v. Felix*, 545 U.S. 644, 654 (2005) (The principles of "relation back" embodied in Federal Rule of Civil Procedure 15 apply to habeas corpus cases.).

On April 18, 2014, the clerk received Dumitru's habeas corpus petition. DE 5. In the petition, Dumitru declared under penalty of perjury that he signed it on January 17, 2014. Inmates are entitled

---

[4] When necessary, the 1-year period of limitation is counted as (and divided into) days. *See Holland v. Florida*, 560 U.S. 631, 638 (2010) ("At that point, the AEDPA federal habeas clock again began to tick – with 12 days left on the 1-year meter.")

[5] The docket sheet shows that Dumitru began this case (DE 1) by filing a "habeas corpus petition." The clerk docketed the "Motion for Investigation" that way because it made reference to habeas corpus and was not filed in an existing case. Doing so was an administrative decision which allowed the court to review the filing as a new case. However, after examining the document, the court clarified in its order (DE 2) that it was not a habeas corpus petition.

3

to the mailbox rule,[6] but the petition does not say when it was mailed.[7] However, it is clear that it was not mailed (nor could the completed petition have even been signed) on January 17, 2014, because it includes multiple references to events which occurred after that date. The petition refers to a letter from the Indiana Department of Insurance dated March 28, 2014, and that letter is attached. DE 5 at 7 and DE 5-1 at 21. The petition also makes one other reference to events in March 2014. DE 5 at 9. Also attached to the petition is a copy of the Motion for Investigation (the first filing in this case, DE 1) with its certificate of service dated March 12, 2014, DE 5-1 at 18; a "Complaint for Investigation" dated January 28, 2014, which was sent to the United States Attorney's office, DE 5-1 at 19; and a copy of this court's order dated March 20, 2014. DE 3 and DE 5-1 at 27. Thus, the petition could not have been mailed before March 28, 2014, but likely several days after that since the attached March 28, 2014, letter from the Indiana Department of Insurance was mailed from Indianapolis, Indiana, to Dumitru at the Indiana State Prison in Michigan City, Indiana. Therefore, the petition was at least two and a half months late.

A.

In his Traverse, Dumitru argues that the court should excuse the untimeliness of his petition because it would be a fundamental miscarriage of justice if the court did not address the merits of his claims. This is an equitable doctrine which can excuse procedural default. *See Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013). In order to demonstrate a fundamental miscarriage of

---

[6] *Edwards v. United States*, 266 F.3d 756, 758 (7th Cir. 2001) ("We need not decide here whether there is any kind of paper, or any circumstance, under which a district court would be entitled to hold a pro se prisoner litigant to an actual receipt standard, but we are confident that this would be an exceptional situation.").

[7] In his Traverse, Dumitru acknowledges that even if he had mailed the habeas corpus petition on January 17, 2014, it would still have been untimely.

justice, the petitioner must prove that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

In *McQuiggin v. Perkins*, 569 U.S. __, __;  133 S. Ct. 1924, 1931-33 (2013), the United States Supreme Court recognized that actual innocence can excuse the untimeliness of a habeas corpus petition. However, this is a very difficult standard to meet.

> To invoke the miscarriage of justice exception to AEDPA's statute of limitations, we repeat, a petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing.

*McQuiggin*, 133 S. Ct. at 1935 (quotation marks and citation omitted). A petitioner who asserts actual innocence "must *demonstrate* innocence; the burden is his, not the state's . . .." *Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003) (emphasis in original). Furthermore, actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). To support a claim of actual innocence the petitioner must come forward with "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial," *id.*, and must show that "in light of new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537 (2006). Because of the difficulty of meeting this standard, such claims are "rarely successful." *Schlup*, 513 U.S. at 324.

In an attempt to meet this standard, Dumitru argues:

> Much of Petitioner's claims on the merits involve his disability in the English language. He alleges that because his attorneys failed to secure a translator, he was seriously hindered in his own defense. He states that his attorneys failed to present testimony that Dumitru could not understand or communicate in the English language, and therefore had not knowingly confessed to the charged crimes; failed to interview the available witnesses with a certified Romanian interpreter; was forced

5

to trial when Dumitru had limited English proficiency and did not have a fair trial; failed to contact the Romanian Embassy; [and] failed to contact the Romanian consulate which would have provided free interpreters.

Traverse, DE 38 at 3 (quotation marks and citations omitted).

None of these arguments are new. Dumitru testified during his trial and the jury heard him answer numerous questions about his language skills. Trial Record at 679-740. During his criminal trial, a Romanian interpreter translated the proceedings for Dumitru. *See e.g.* Trial Record at 490 and 568. When Dumitru testified, the interpreter translated the questions asked of him, but the court permitted Dumitru to answer in either Romanian or English. *Id.* at 678. His defense counsel explained that he did this to "show that he has trouble with the English language." *Id.* Then during closing argument, defense counsel reminded the jury that "John Dumitru whose first language is Rumanian . . . needs a translator for this trial . . .." *Id.* at 802. Additionally, claims about Dumitru's difficulty with English were raised and adjudicated during his direct appeal. The Court of Appeals of Indiana found that "his English is described as 'broken,'" *Dumitru v. State*, 75A05-0108-CR-384 (Ind. Ct. App. March 28, 2002), 13-6 at 3, but that this did not impair his ability to conduct various legal transactions in English.

> The State presented evidence that Dumitru became a naturalized American citizen in 1988, his primary residence has been in the United States since 1982, he communicates in English with friends, acquaintances and business associates, and he listens to English speaking radio programs. In addition, Dumitru had employed an attorney on four prior occasions. Indeed, Dumitru previously pleaded guilty to a crime, and he had told that trial court that he understood his rights before entering his plea. And despite Dumitru's testimony that he did not understand legal terms, during his tape-recorded statement to Detective Lawson, Dumitru used the term "consent" with reference to his effort to gain permission to bring someone to the United States from Romania. Finally, we find it telling that when Dumitru applied for a driver's license in 1992 and had trouble understanding some of the questions on the driver's examination, he asked an employee with the BMV to explain those questions. Although that employee spoke no Romanian, Dumitru testified that she was able to explain the questions in a way that he could understand them. By

6

contrast, here, when Detective Lawson asked Dumitru whether he understood each sentence of the Miranda rights card and waiver form, Dumitru replied affirmatively every time and never asked for an additional explanation of terms.

*Dumitru v. State*, 75A05-0108-CR-384 (Ind. Ct. App. March 28, 2002), 13-6 at 6-7. In deciding this habeas corpus proceeding, this court must presume the facts set forth by the State courts are correct. 28 U.S.C. § 2254(e)(1). It is Dumitru's burden to rebut this presumption with clear and convincing evidence. *Id.* Here, he has not done so.

Nevertheless, even if these language issues were new and he had conclusively demonstrated that he was incapable of understanding English, none of that would demonstrate that he was factually innocent of these crimes. Nothing about Dumitru's lack of English proficiency (even if totally lacking) undermines the evidence of his guilt. Here is how the Court of Appeals of Indiana explained the facts of this case.

> On the morning of April 23, 2000, Dumitru was at home with his wife, Mariana, his teenaged step-daughter, Liliana, his two young sons, and his infant daughter. Dumitru drank some brandy, and his friend James Clemons came by for a visit. While Dumitru and Clemons talked, Liliana sat at the kitchen table with them. After Clemons left, Dumitru became angry with Liliana and told her that it was rude of her to sit and listen to his conversation with Clemons. Dumitru yelled at Liliana, and Mariana intervened, telling Dumitru to leave Liliana alone. Dumitru became angrier, and he and Liliana were yelling at each other. Liliana eventually left the kitchen, but Dumitru was still yelling. Mariana took Dumitru's glass and threw the brandy in his face. Then Mariana went out to the garage, found Dumitru's bottle of brandy, and smashed it on the ground. Mariana also found a dirty diaper and threw it against a window where Dumitru was standing inside the house.
> While Mariana was outside sweeping up the broken glass, she heard Liliana scream. Mariana ran back into the house and found Liliana lying motionless on the living room floor. Dumitru was standing nearby holding a rifle. Mariana asked Dumitru what he had done, but he did not respond. Mariana then knelt down and tried to determine whether Liliana was breathing, and Dumitru hit Mariana on the head with the rifle butt. Dumitru then hit Mariana twice more, on her hip and ankle. But Mariana was able to run out of the house, and she sought help from a neighbor, who telephoned law enforcement.
> When deputies from the Starke County Sheriffs Department arrived, Dumitru would not let them into the house. Dumitru was standing at a window holding his

> two young sons. After an hour-long standoff, deputies forced their way into the house, found Liliana lying in a pool of blood, and arrested Dumitru. Liliana was taken to a nearby hospital, where she died two days later.
> 
>     At the Starke County Jail, Detective Ron Lawson read Dumitru his Miranda rights. Dumitru is Romanian, and he speaks both Romanian and English, but his English is described as "broken." As Detective Lawson read the Advice of Rights and waiver form to Dumitru in English, Detective Lawson stopped at the end of each sentence and asked Dumitru whether he understood what had been read to him. Dumitru answered affirmatively each time. After Dumitru signed the waiver form, Detective Lawson took Dumitru's tape-recorded statement. Dumitru admitted that he had struck Liliana and Mariana with his rifle. A deputy administered a breathalyzer test, which indicated that Dumitru's blood alcohol content was .08%.

*Dumitru v. State*, 75A05-0108-CR-384 (Ind. Ct. App. March 28, 2002), 13-6 at 2-3. If the jury believed that Dumitru was unable to communicate in English, they could have discredited his confession as meaningless. However, the absence of his confession does not undermine the other evidence against him nor demonstrate factual innocence. Even without his confession, there was more than enough evidence to have found him guilty. His wife testified that after hearing her daughter scream, she rushed into the house and found Dumitru standing over her unconscious body with a rifle. Trial Record at 206-07. She testified that Dumitru then hit her with the rifle three times before she ran from the house. *Id.* at 208-12. His neighbor testified that Dumitru's wife was bleeding from the head as she ran screaming from the house. *Id.* at 117. A Starke County Sheriff's Deputy testified that when he arrived at the house in response to a 911 call, he saw Dumitru standing at a window holding a rifle. *Id.* at 151-55. The Starke County Sheriff testified that when he entered the house after negotiating with Dumitru in English, he saw the daughter lying on the floor with blood on her head. *Id.* at 286-95 and 304. The emergency room physician testified that when the daughter arrived at the Hospital, she had a depressed skull fracture and he saw some of her brain on the sheet. *Id.* 354-57. The pathologist testified that the daughter had been struck in the head at least three times. *Id.* at 577. He testified that the depressed skull fracture was inflicted while the head was

8

stationary – such as laying on the floor – and the size and shape of the injury was consistent with a blow from the butt of a gun. *Id.* at 578-80. None of this evidence, nor any of the other testimony about these crimes, is in anyway dependant on whether Dumitru can (or cannot) communicate in English. Therefore he has not demonstrated that he is factually innocent and it would not be a fundamental miscarriage of justice to find that this habeas corpus petition is untimely.

B.

In his Traverse, Dumitru also argues that the court should excuse the untimeliness of his petition because he is entitled to equitable tolling. "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631 (2010) (quotation marks and citation omitted). Equitable tolling is an extraordinary remedy that is rarely granted. *Obriecht v. Foster*, 727 F.3d 744, 748 (7th Cir. 2013). "Petitioners bear the burden of proving that they qualify for equitable tolling." *Taylor v. Michael*, 724 F.3d 806 (7th Cir. 2013).

Dumitru argues that the extraordinary circumstance in this case is "the disability of petitioner as to the English language . . . ." DE 38 at 2. However, he has not submitted, nor even described, any evidence which could prove that language difficulties prevented him from submitting a timely habeas corpus petition before the deadline expired. The Court of Appeals of Indiana found that he was a naturalized American citizen whose English proficiency was sufficiently developed for him to conduct various legal transactions. As previously explained, the court must accept that factual finding because Dumitru has not rebutted it. *See* 28 U.S.C. § 2254(e)(1).

The record shows that, Dumitru's friend testified that he had known him for more than a decade and had always spoken with him in English. Trial Record at 56-57 and 385-86. That friend

9

also testified that Dumitru wrote a letter in English and was generally able to read and understand English newspapers. *Id.* at 60-62. An elementary school principal testified that she was able to communicate with Dumitru in English without an interpreter during four meetings at the school. *Id.* at 64. Dumitru testified that he was able to communicate with his doctors in English. *Id.* at 24. At his post-conviction relief hearing, on June 8, 2012, he argued and testified in English without an interpreter. Post-Conviction Record at 21. He testified that he has limited writing ability, but is able to answer questions in English. *Id.* at 26. He testified that he wrote many pages in English and sent them to the Indiana Judicial Qualifications Commission. *Id.* at 34-35. He testified that he wrote in English the one page letter (numbered 2) that was introduced at the hearing. *Id.* at 28 and 34. That letter says, in part, "Dumitru believe when arrest him must give his right to talk Attorney and Interpreter before say anything for no further Questions, He knew I am Romanian, he knew I needs Attorney by Law says, why he disobey the Law?" *Id.* at Exhibit 2. The phrasing of that sentence (and the rest of the letter) is not unintelligible. Dumitru understands the *Miranda* issue that he is explaining and that sentence fairly communicates that issue to the reader. The post-conviction relief hearing was both transcribed and recorded. *See* CD recording included with Post-Conviction Record transcript. The Court of Appeals observed that "his English is described as 'broken.'" *Dumitru v. State*, 75A05-0108-CR-384 (Ind. Ct. App. March 28, 2002), 13-6 at 3. Listening to that recording confirms that observation. Though English communication for (and with) Dumitru is more difficult because he is not a native English speaker, the record in this case demonstrates that those difficulties do not prevent him from communicating in English.

The record also demonstrates that despite those language difficulties, he was not impeded in his ability to litigate. From 2003 to 2013, he prosecuted or appealed the denial of his post-

10

conviction relief petition – including an interlocutory appeal and seeking transfer to the Indiana Supreme Court. DE 13-1 and 13-3. He filed a habeas corpus petition in 2004. *Dumitru v. Davis*, 3:04-CV-438 (N.D. Ind. filed June 28, 2004). He filed a civil rights lawsuit in 2005. *Dumitru v. Matsey*, 2:05-CV-308 (N.D. Ind. filed August 16, 2005). He filed and appealed another civil rights lawsuit in 2006. *Dumitru v. Winfrey*, 1:06-CV-417 (S.D. Ind. filed March 13, 2006), *Dumitru v. Winfrey*, 3:06-CV-309 (N.D. Ind. filed May 11, 2006), and *Dumitru v. Winfrey*, 06-2828 (7th Cir. filed June 28, 2006). In 2001, he appealed his divorce decree and in 2002 he sought re-hearing before the Court of Appeals of Indiana and then transfer to the Indiana Supreme Court. *Dumitru v. Dumitru*, 75A03-0201-CV-00011 (Ind. Ct. App. filed November 15, 2001). In 2007, he again appealed his divorce proceeding and in 2008 he sought reinstatement and then petitioned to transfer to the Indiana Supreme Court. *Dumitru v. Dumitru*, 75A05-0704-CV-00235 (Ind. Ct. App. filed April 23, 2007). In 2006, he filed a civil lawsuit LaPorte County, *Dumitru v. Babu*, 46D01-0610-MI-165 (LaPorte Superior Court), and another in Allen County, *Dumitru v. Czaja*, 02C01-0610-CT-84 (Allen Circuit Court). The following year, in 2007, he filed appeals in both of those State court civil cases. *Dumitru v. Babu*, 46A03-0701-CV-00057 (Ind. Ct. App. filed January 3, 2007) and *Dumitru v. Czaja*, 02A04-0702-CV-00084 (Ind. Ct. App. filed January 12, 2007).[8]

Dumitru testified that he had the assistance of other inmates to prepare and file many documents. Post-Conviction Record at 27-28 and 34. However, given his ability to communicate in English (both orally and in writing), as well as the extent and duration of his litigation activities, there is no indication that his difficulty in communicating in English was an extraordinary

---

[8] Indiana appellate Chronological Case Summaries for all cited cases are available at *Clerk of the Appellate Courts*, (January 12, 2016, name search by litigant John Dumitru), https://publicaccess.courts.in.gov/docket/.

11

circumstance which prevented him from timely filing a habeas corpus petition before the deadline expired.

The petition, when it was filed, was at least two and a half months late. Dumitru has not excused the untimeliness of this petition, therefore it must be dismissed. Though this might seem harsh, even petitions that are one day late are time barred.

> Foreclosing litigants from bringing their claim because they missed the filing deadline by one day may seem harsh, but courts have to draw lines somewhere, statutes of limitation protect important social interests, and limitation periods work both ways – you can be sure [the petitioner] would not be pooh-poohing the prosecution's tardiness if [he] had been indicted one day after the statute of limitations expired for [his] crimes.

*United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000) (citation omitted). *See also Simms v. Acevedo*, 595 F.3d 774 (7th Cir. 2010).

C.

Finally, pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the court must consider whether to grant a certificate of appealability. When the court dismisses a petition on procedural grounds, the determination of whether a certificate of appealability should issue has two components. *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). First, the petitioner must show that reasonable jurists would find it debatable whether the court was correct in its procedural ruling. *Id.* at 484. If the petitioner meets that requirement, then he must show that reasonable jurists would find it debatable whether the petition states a valid claim for the denial of a constitutional right. *Id.*

As previously explained, this petition is untimely. Dumitru argued that he was factually innocent. However, he did not point to any new evidence not presented during his trial which could possibly show that it is more likely than not that no reasonable juror could have found him guilty. Dumitru argued for equitable tolling. However, he did not demonstrate that an extraordinary

12

circumstance prevented him from filing a timely habeas corpus petition. Because there is no basis for finding that jurists of reason would debate the correctness of this procedural ruling or find a reason to encourage him to proceed further, a certificate of appealability must be denied.

For these reasons, the court **DISMISSES** this habeas corpus petition because it is untimely and **DENIES** a certificate of appealability.

SO ORDERED.

ENTERED: January 20, 2016

      /s/ JON E. DEGUILIO
Judge
United States District Court